[No. B238277. Second Dist., Div. Three. Aug. 5, 2014.]

DARREN HAGER, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

[No. B239897. Second Dist., Div. Three. Aug. 5, 2014.]

DARREN HAGER, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1105(c) and 8.1110, the Introduction, Factual and Procedural Background, part 1 of the Discussion, and the Disposition are certified for publication.

COUNSEL

Love & Erskine, Richard A. Love and Beth A. Shenfeld for Plaintiff and Appellant and for Plaintiff and Respondent.

Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendants and Appellants and for Defendants and Respondents.

OPINION

**ALDRICH, J.—**

## INTRODUCTION

In a whistleblower retaliation lawsuit brought under Labor Code section former 1102.5, subdivision (b) (hereafter section 1102.5(b)),[1] the plaintiff must establish a prima facie case of retaliation. The plaintiff must show he engaged in protected activity, his employer subjected him to an adverse employment action, and there is a causal link between the two. If the plaintiff meets his prima facie burden, the defendant has the burden to prove a legitimate, nonretaliatory explanation for its actions. To prevail, the plaintiff has to show that the explanation is a pretext for the retaliation. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 [37 Cal.Rptr.3d 113].)

In *Hager v. County of Los Angeles* (Mar. 25, 2010, B208941) (nonpub. opn.)) (*Hager I*), we held that plaintiff Darren Hager could pursue his

---

[1] At the time of the trial, former section 1102.5(b) provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Amendments to this subdivision that became effective on January 1, 2014 (Stats. 2013, ch. 781, § 4.1) are not pertinent to our analysis. Subdivision (e) of former section 1102.5 provided: "A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b)." All further citations to former section 1102.5 are to the former version of the statute.

All further undesignated statutory references are to the Labor Code.

whistleblower retaliation lawsuit against his employers, defendants the County of Los Angeles and the Los Angeles County Sheriff's Department (collectively, County). The County appeals from a judgment entered after a substantial jury verdict in Hager's favor. Hager appeals from the postjudgment order denying his request for attorney fees.

The County's principal contentions on appeal address two errors with respect to the parties' burdens of proof. The County contends Hager did not prove that he engaged in a protected activity to establish a prima facie case of whistleblower retaliation (former § 1102.5(b)) because he did not "disclose information," as that term has been defined in *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 858–859 [136 Cal.Rptr.3d 259] (*Mize-Kurzman*). The County also contends the trial court erred in relying on the Public Safety Officers Procedural Bill of Rights Act (POBRA) (Gov. Code, § 3300 et seq.) to exclude the County's evidence of past conduct not included as a basis to terminate Hager during the administrative proceedings but presented in this civil action as additional reasons to support its decision to terminate Hager. The County also challenges the sufficiency of the evidence to support the damages award, raises evidentiary errors, and asserts juror misconduct.

We initially affirmed in part and reversed in part, concluding the trial court did not err in excluding evidence of past conduct and there was no substantial evidence to support the economic damages awarded to Hager. The County and Hager petitioned for rehearing. The County argued in its petition that we affirmed the exclusion of evidence of its undisclosed reasons to terminate Hager by improperly relying on Evidence Code section 352 without any support in the record that the trial court engaged in balancing the probative value of this evidence against the prejudicial impact. Hager argued in his petition that we omitted key facts that his termination constituted a "blot on his resume" and significantly impaired his future earning capacity, which is sufficient evidence to support the jury's award of economic damages. We granted the petitions for rehearing to address these issues.

We conclude the County's interpretation of former section 1102.5(b) as limiting whistleblower protection to the first employee who discloses a violation of state or federal law that had not been previously disclosed by another employee is contrary to the plain statutory language and legislative intent in enacting former section 1102.5(b). In the unpublished portion of this opinion, we further conclude the trial court did not abuse its discretion in excluding evidence of undisclosed reasons for terminating Hager. The record contains affirmative indications the trial court considered and understood that the introduction of undisclosed reasons for the decision to terminate Hager was not relevant and was prejudicial. We further conclude there is no

substantial evidence to support the jury's award of economic damages. Accordingly, we reverse that portion of the judgment, but in all other respects we affirm. We also affirm the order denying Hager's motion for attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

Hager worked for the Los Angeles County Sheriff's Department (LASD) as a deputy sheriff from 1988 to 2003. In 2000, Hager was appointed as the LASD liaison to a federal Drug Enforcement Agency (DEA) task force (DEA task force) investigating a large methamphetamine organization in the Antelope Valley. The DEA task force was formed after Hager brought information to his command staff that a felony suspect was willing to provide the names of several methamphetamine dealers in the Antelope Valley in exchange for leniency. By all accounts, the DEA task force was a success.

The informant also gave Hager information that linked the disappearance of a deputy sheriff with the methamphetamine organization in the Antelope Valley. While working on the DEA task force, Hager obtained information that led him to believe the missing deputy sheriff had been murdered. Hager accused another deputy of being involved in the murder, the cover up, and the illicit methamphetamine trade in the Antelope Valley. It is the disclosure of deputy misconduct that is central to Hager's whistleblower retaliation lawsuit.

### 1. Alleged Disclosure of Deputy Misconduct

In June 1998, then off-duty Deputy Sheriff Jonathan Aujay, an ultramarathon runner, disappeared while on a long-distance run at the Devil's Punchbowl County Park in the Antelope Valley. The initial missing person's investigation concluded that Aujay disappeared or committed suicide.

In December 1999, homicide Detective Larry Joseph Brandenburg learned from another deputy sheriff that Aujay may have been murdered and that Deputy Sheriff Richard Engels may have been involved. Brandenburg's captain, Frank Merriman, gave Brandenburg permission to reopen the cold case and investigate Aujay's disappearance.

On March 2, 2000, Brandenburg contacted Hager and asked Hager to speak to his informant about "dirty deputies." The informant told Hager that Engels was involved in narcotics and possibly in the disappearance of Aujay. Hager informed Brandenburg.

a. *March 23, 2000 Disclosure of Deputy Misconduct*

In a March 23, 2000 meeting, then Assistant Sheriff Larry Waldie was briefed on the information Hager had obtained regarding (1) the methamphetamine organization in the Antelope Valley, and (2) Engels's possible involvement in narcotics and Aujay's disappearance. Based on this information, Waldie approved LASD's participation in the DEA task force. The DEA task force's primary mission was to disrupt narcotics trafficking in the Antelope Valley. Hager, as a DEA task force officer, was ordered to conduct only the narcotics investigation. Waldie specifically ordered Hager and the DEA task force not to investigate deputy sheriff wrongdoing or Aujay's disappearance. Any information the DEA task force learned concerning deputy sheriff wrongdoing was to be documented and passed on to either the Internal Criminal Investigations Bureau (ICIB) or the Internal Affairs Bureau (IAB), and any information concerning Aujay was to be passed on to the homicide bureau and Brandenburg.

b. *Hager's Daily Reports to Shreves*

While a member of the DEA task force, Hager reported to Lieutenant Ronald Shreves on a daily basis. The DEA task force followed federal drug enforcement protocol and obtained information from cooperating sources, and as the investigation continued, obtained information through corroborating sources. The DEA task force also filed warrants and federal wiretap applications. The DEA task force made hundreds of arrests.

During the course of the DEA task force investigation, Hager asked informants about the missing deputy and received information that Aujay was killed because he discovered a methamphetamine lab while out on a long-distance run. Informants told Hager that Engels was at the methamphetamine lab when Aujay was killed. Hager's informants also linked Engels with Tom Hinkle, one of the targets of the DEA task force and a known methamphetamine dealer.

c. *Hager's Summary (September 2000)*

In September 2000, Shreves requested a meeting with command staff to update them regarding the DEA task force and to inform them of potential deputy misconduct. Hager prepared a summary that disclosed information the DEA task force had received regarding Aujay's disappearance. The "main" thrust of the meeting was the "potential that Aujay was murdered and a deputy sheriff might be involved."

d. *Hager's Summary (May 9, 2001)*

After the DEA task force arrested Hinkle, one of the targeted methamphetamine dealers in the Antelope Valley, Shreves asked Hager to prepare a summary of the information the DEA task force had received regarding Engels. The summary revealed information linking Engels to Hinkle and to Aujay's disappearance. Shreves passed this information through the chain of command.

2. *Independent Investigation Discredits Hager's Disclosure of Deputy Misconduct*

As ordered, Hager also was disclosing information to Brandenburg as Brandenburg pursued the homicide investigation. During the course of his investigation, Brandenburg obtained information that Aujay had discovered a methamphetamine lab adjacent to Devil's Punchbowl County Park while on a long-distance run. Brandenburg was convinced that Engels was involved in an ongoing criminal drug conspiracy, and that Engels and some other unidentified individuals had murdered Aujay to prevent him from arresting them or exposing their criminal enterprise. Brandenburg prepared an affidavit for a search warrant to serve on Engels, but his captain would not let him take it to a judge. Brandenburg's partner testified that their captain did not think the information they had obtained was credible. Brandenburg's partner agreed with the captain.

Brandenburg went over his captain's head to present his investigation results to the command staff. Brandenburg was taken off the investigation.

a. *Shreves's Memo*

In February 2001, Shreves sent a memorandum to his command in which he addressed Brandenburg's homicide investigation. Shreves formed the opinion that the homicide bureau and the command staff were failing to "credibly investigate the disappearance and possible murder of . . . Aujay." Shreves also felt that the members of the DEA task force were "being cruelly and unnecessarily besmirched to a wide audience of department personnel."

b. *Holmes's Investigation*

In March 2001, after Shreves submitted his memo, Sergeant Joe Holmes was assigned to investigate the information Brandenburg and Hager reported concerning Aujay's disappearance. Holmes interviewed Hager's initial informant who admitted during the tape-recorded session with Holmes that he had lied to Hager. Holmes testified he interviewed 60 people and there was not

one piece of credible evidence linking Engels to drug trafficking in the Antelope Valley or to the murder, death, or disappearance of Aujay. Many of the individuals previously interviewed by Hager denied making the statements attributed to them. Holmes also discovered that many of the reported statements were not credible. Holmes described the accusations against Engels as a "misinterpretation of information" on a "large scale."

Holmes did not believe that Engels was a suspect in Aujay's disappearance. He thought Hager was actively investigating Aujay's disappearance in violation of direct orders. Holmes also dismissed Brandenburg's conclusions that Aujay had been murdered and stated that the most likely scenario was Aujay had committed suicide.

At the conclusion of his investigation, Holmes met with command. Both Hager and Shreves were present. Shreves was critical of Holmes's conclusions and believed Holmes had not conducted a comprehensive investigation.

Shreves was ordered to write a memorandum identifying the deficiencies in Holmes's investigation. Shreves prepared a 56-page memorandum. Shreves explained in the memorandum that the DEA task force had received information that a deputy sheriff may have been involved with the methamphetamine organization, and Aujay may have been murdered by that organization. He noted the DEA task force had been "admonished not to conduct follow-up [regarding] alleged personnel wrongdoing or the alleged murder." Shreves felt the DEA task force was being "criticized for bringing forth uncorroborated information," but was ordered not to corroborate the information. As Shreves noted, "[t]o do no follow-up and also corroborate information is an impossible task."

In preparing the 56-page memorandum, Shreves relied on a synopsis Hager prepared. The synopsis contained representations regarding the content of federal wiretapped conversations.

### 3. *Hager's Termination*

Hager became the subject of an IAB investigation. Engels and four other deputy sheriffs filed a complaint against Hager. Shreves's 56-page memorandum focused the investigation on whether Hager had violated a direct order not to investigate Aujay's disappearance.

At the conclusion of the yearlong IAB investigation, Hager was charged with conducting a personnel investigation and making false statements to his supervisors. The internal affairs investigator believed that Hager had misrepresented wiretapped conversations to support his theory that (1) Engels was

involved in the methamphetamine organization in the Antelope Valley, and (2) Engels was one of the individuals involved in Aujay's murder, death, or disappearance.

Chief Neal Tyler reviewed the IAB investigation and concluded the appropriate discipline was termination. Tyler had been given a range of discipline options, which indicated the recommended discipline was suspension for 10 to 15 days. Tyler considered suspension, but he testified that suspension was not appropriate "for the series of offenses that [he] saw in this investigation over the two-year period."

In December 2002, Hager received a letter of intent to discharge. The letter indicated the IAB investigation had established Hager "conducted a personnel investigation regarding Deputy Richard Engels and recklessly accused Deputy Engels of associating with drug dealers and having knowledge/involvement in the alleged murder of Deputy Jonathan Aujay." The letter also stated the IAB investigation established Hager made false statements to Shreves "concerning information gleaned from Federal wire taps and/or various informants, which was used to support [his] theory that Deputy Richard Engels was involved in criminal acts with known drug dealers and may have been involved in the alleged murder of Deputy Aujay." LASD held two *Skelly*[2] hearings addressing these charges in January and July 2003, at which Hager was represented by counsel. On July 28, 2003, Hager learned he had been terminated.

In April 2003, before his second *Skelly* hearing, Hager filled out an application for disability retirement. Hager suffered neck and back injuries in March 2002 while on duty. His disability retirement was granted on September 3, 2003.

### 4. *Hager's Evidence of Retaliation*

Hager attacked the results of the IAB investigation, presenting evidence that he did not conduct an investigation into Engels's wrongdoing or Aujay's disappearance. Hager also discredited Holmes's investigation, and the IAB investigation because there was no mention of Hager's work on the DEA task force, and the investigators failed to interview other members of the DEA task force. Specifically, Hager noted that the foundation of both the Holmes investigation and the IAB investigation was that Hager's sources were not credible, but the investigators completely ignored that these same informants had given reliable and corroborated information to the DEA task force that led to numerous arrests. Hager also pointed out the inconsistency of being

---

[2] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

charged with conducting an unauthorized investigation and being criticized for conducting an incompetent investigation.

With respect to the charge that Hager had falsely reported wiretapped conversations, Hager testified that the information he relayed to Shreves were summaries prepared by others, and not verbatim transcriptions. Hager had been ordered to pass this information along so other deputy sheriffs could investigate deputy misconduct. When questioned about the false statements in the summaries, Hager took exception to the internal affairs investigator's conclusions that the information Hager relayed to Shreves was false or failed to include exculpatory statements. The jury also heard testimony that wire-tapped conversations must be interpreted in context because the drug culture has its own language and code.

### 5. Jury Verdict, Motion for New Trial, Appeal

The jury returned a special verdict in Hager's favor, awarding $4,506,015 in damages. The award included $2,006,015 in lost earnings ($806,041 in backpay and $1,199,974 in future lost income), and $2,500,000 in noneconomic damages.

The trial court denied the County's motion for new trial. Thereafter, the trial court denied Hager's request for attorney fees.

The County timely appeals from the judgment. Hager filed an appeal from the order denying attorney fees. We consolidated the appeals.

### 6. Petitions for Rehearing

After our original opinion issued, the County filed a petition for rehearing in which it again argued that the trial court erred in excluding evidence of Hager's past conduct (motions in limine), and erred in excluding Tyler's testimony of his undisclosed reasons for terminating Hager. The County contended our conclusion that this evidence was properly excluded under Evidence Code section 352 was legal error.

Hager filed a petition for rehearing in which he contended we omitted key facts that would have supported the jury's award of economic damages.

We granted the petitions to clarify our opinion on these two issues. Additional facts will be presented with the relevant issue in the discussion section.

## DISCUSSION

### *County's Appeal*

1. *Former Section 1102.5(b)*

Relying on *Mize-Kurzman, supra,* 202 Cal.App.4th 832, the County contends that Hager did not "disclose information" under former section 1102.5(b) because the LASD already knew that Engels might have been involved in drug trafficking and in Aujay's disappearance before Hager disclosed this information. The County cites to evidence that Brandenburg or other unidentified deputy sheriffs, and not Hager, were the first to disclose Engels's alleged unlawful conduct.

As a preliminary matter, we are concerned here with whether Hager disclosed information in March 2000.[3] After that date, the reports to Shreves and up the chain of command cannot be considered "blowing the whistle," as Hager was ordered as part of an internal personnel matter to report any further information he obtained during the course of the DEA task force investigation.

█ Former section 1102.5(b) protects an employee from retaliation by his employer for making a good faith disclosure of a violation of federal or state law. (Former § 1102.5(b); *Patten v. Grant Joint Union High School Dist., supra,* 134 Cal.App.4th at p. 1384.) A report made by an employee of a government agency to his employer is a disclosure of information to a government or law enforcement agency pursuant to former section 1102.5(b). (Former § 1102.5, subd. (e); *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1308, 1312–1313 [130 Cal.Rptr.2d 347].) "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal.Rptr.2d 16, 960 P.2d 1046].)

---

[3] In Hager's brief, he alternatively argues that he made a disclosure to the DEA that is protected under former section 1102.5(b). This assertion is not supported by citation to the record, nor does the record reflect any factual or legal theory that there is a causal connection between Hager's report to the DEA and retaliation by the LASD. We also reject Hager's arguments that the County has forfeited the issue, or is estopped from raising the issue because in *Hager I* the County admitted that Hager made a protected disclosure. An admission in a summary judgment motion or separate statement is not binding on the parties in subsequent proceedings. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746–747 [100 Cal.Rptr.3d 658].)

### a. *Mize-Kurzman*

In *Mize-Kurzman, supra,* 202 Cal.App.4th 832, the court considered whether a jury had been adequately instructed on federal law limitations applicable to state whistleblower protection. (*Id.* at pp. 844–845.) A special instruction to the jury stated, "[r]eporting publicly known facts is not a disclosure of information" within the meaning of former section 1102.5. (*Mize-Kurzman,* at p. 845.) Consistent with federal law, the *Mize-Kurzman* court held reporting information that already was known to the employer did not constitute a protected disclosure. (*Id.* at p. 858.) Citing the Legislature's choice of the word "disclosing," and "discloses," in former section 1102.5(b), the court reasoned the plain meaning and dictionary definition of "disclosure," is to " 'reveal something that was hidden and not known.' " (*Mize-Kurzman,* at p. 858.) The *Mize-Kurzman* court supported this interpretation of "disclosure" by relying on federal and state cases addressing protected disclosures. (*Id.* at p. 859.)

The County reads *Mize-Kurzman, supra,* 202 Cal.App.4th 832 as limiting the protections of former section 1102.5(b) to the first employee who discloses a violation of state or federal law that had not been *previously* disclosed by another employee. No such "first report" limitation was discussed in *Mize-Kurzman,* appears in former section 1102.5(b), or is addressed in the federal and state cases cited and relied on by the *Mize-Kurzman* court.

### b. Mize-Kurzman *Does Not Adopt a "First Report" Rule*

In *Mize-Kurzman, supra,* 202 Cal.App.4th 832, the plaintiff made four disclosures of unlawful conduct to the alleged wrongdoers. (*Id.* at pp. 840–842.) With respect to one of the disclosures of unlawful activity, Mize-Kurzman's supervisor testified at trial that she already was aware that programs receiving state funds could not discriminate against students, and with respect to two of the other disclosures, it was disputed at trial whether the community college policies Mize-Kurzman viewed as unlawful actually violated the law. (*Ibid.*) It was in this factual context that the court considered whether Mize-Kurzman made a protected disclosure under former section 1102.5(b). The court never considered whether a second employee who disclosed the same unlawful activity that Mize-Kurzman disclosed would or would not have been protected under former section 1102.5(b).

### c. *Former Section 1102.5(b) Does Not Support a "First Report" Rule*

The plain language of former section 1102.5(b) also does not limit whistleblower protection only to an employee who discloses unlawful conduct that had not been previously disclosed by another employee. The verb

"disclose" is not defined in the statute, and the *Mize-Kurzman* court gave the statutory term its plain and commonsense meaning. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284].) ■ But words and phrases are construed according to context and approved usage of language. (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) While we accept the dictionary definition of "disclosure" as used by the court in *Mize-Kurzman, supra,* 202 Cal.App.4th 832, the court did not construe the statutory language in the context of the statute as a whole.

■ Subdivision (e) of former section 1102.5 provides that a "report" by an employee of a government agency to his or her employer is a disclosure of information under former section 1102.5(b). A report does not necessarily reveal something hidden or unknown. To the extent *Mize-Kurzman* has highlighted an inconsistency in the statute, that is, a public employee must merely "report" unlawful conduct, and other employees must "disclose," unlawful conduct, it is up to the Legislature to resolve this issue, not this court.

We also view the "first report" rule the County proposes as contrary to the legislative intent in enacting former section 1102.5(b). Protection only to the first employee to disclose unlawful acts would defeat the legislative purpose of protecting workplace whistleblowers, as employees would not come forward to report unlawful conduct for fear that someone else already had done so. The "first report" rule would discourage whistleblowing. Thus, the County's interpretation is a disincentive to report unlawful conduct. We see no such reason to interpret the statute in a manner that would contradict the purpose of the statute.

> d. *Cases Cited in* Mize-Kurzman *Do Not Support a "First Report" Rule*

The federal cases cited in *Mize-Kurzman, supra,* 202 Cal.App.4th 832, do not articulate a "first report" rule. *Mize-Kurzman* cites to federal law for the proposition that the report of information "that was already known did not constitute a protected disclosure." (*Id.* at p. 858.) One of those federal cases is *Huffman v. Office of Personnel Management* (Fed.Cir. 2001) 263 F.3d 1341 (*Huffman*),[4] which addressed, among other things, the question of whether complaints to a supervisor about the supervisor's conduct constitute a protected disclosure under the federal Whistleblower Protection Act of 1989 (Pub.L. No. 101-12 (Apr. 10, 1989) 103 Stat. 16; codified in scattered

---

[4] *Huffman, supra,* 263 F.3d 1341, was superseded by the Whistleblower Protection Enhancement Act of 2012 (WPEA) (Pub.L. No. 112-199 (Nov. 27, 2012) § 101(b)(2)(C), 126 Stat. 1465, 1465–1466).

sections of 5 U.S.C.) (hereafter, the federal Act). (*Huffman, supra,* at pp. 1344, 1347.) *Huffman* did not articulate a "first report" rule as between two employees reporting unlawful conduct.

The *Huffman* court followed its precedent that disclosures to the wrongdoer are not protected because the wrongdoer already knew of the misconduct. (*Huffman, supra,* 263 F.3d at pp. 1349–1350.) The court also supported its decision by relying on the dictionary definition of "disclosure." (*Ibid.*) The court found "significant" that "Congress in the [federal] WPA did not use a word with a broader connotation such as 'report' or 'state.' " (*Id.* at p. 1350.) As the *Huffman* court noted, the purpose of the federal Act is to encourage disclosures to those that are likely to remedy the wrong, and "[t]he wrongdoer is not such a person." (*Ibid.*)

On this point, *Huffman* is not consistent with California courts applying former section 1102.5(b) when public employees report unlawful conduct. (See, e.g., *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 825–827 [133 Cal.Rptr.3d 751].) In *Jaramillo,* the court held that a report of wrongdoing by a public employee to the very person who is engaged in the wrongdoing is covered by the statute. (*Id.* at pp. 825–826; see *Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236, 240, 242–243 [101 Cal.Rptr.2d 893] [housing authority employee who reported to authority commissioners illegal conduct of employee and contractor is covered by the statute].)

Although the *Mize-Kurzman* court cites our decision in *Colores v. Board of Trustees, supra,* 105 Cal.App.4th 1293, as in line with *Huffman,* in that case we did not address the issue of whether a report to a wrongdoer is a protected disclosure, or what constitutes a protected disclosure. Rather, we concluded that a public employee is entitled to the protection of former section 1102.5(b) if she reported wrongdoing to her agency and had no need to inform some other governmental agency in order to qualify as a whistleblower. (*Colores v. Board of Trustees,* at pp. 1312–1313.)

Likewise, *Patten v. Grant Joint Union High School Dist., supra,* 134 Cal.App.4th 1378, also cited by the *Mize-Kurzman* court, does not discuss what constitutes a protected disclosure, but relies on *Colores v. Board of Trustees* for the proposition that a state employee discloses information protected under former section 1102.5(b) when she reports the activity to the supervisor in her own agency. (*Patten v. Grant Joint Union High School Dist.,* at pp. 1385–1386.) Cases are "not authority for propositions neither considered nor discussed in the opinion." (*In re Muszalski* (1975) 52 Cal.App.3d 500, 504 [125 Cal.Rptr. 286].)

*Mize-Kurzman, supra,* 202 Cal.App.4th 832, also cited two federal cases that held reporting publicly known information was not a protected disclosure

under the federal Act. (*Mize-Kurzman*, at p. 858.) These cases involve an administrative judge's disclosure in an opinion that a federal agency had incorrectly interpreted federal laws reflected in prior decisions of administrative judges (*Meuwissen v. Department of Interior* (Fed.Cir. 2000) 234 F.3d 9, 12–13),[5] and a disclosure that a federal agency failed to reopen a claim for retirement benefits after it was revealed to the agency that it had incorrectly interpreted civil service laws (*Francisco v. Office of Personnel Management* (Fed.Cir. 2002) 295 F.3d 1310, 1313–1314). In these cases, the agency's alleged misconduct was publicly known in the erroneous decision of the administrative judge, and in the agency's decisions erroneously denying benefits.

■ The report of "publicly known" information or "already known" information is distinct from a rule in which only the first employee to report or disclose unlawful conduct is entitled to protection from whistleblower retaliation. Former section 1102.5(b) should be given a broad construction commensurate with its broad purpose. (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 77.)

After the issues were fully briefed, Hager brought to the court's attention that Congress has amended the federal Act to clarify that a disclosure is protected even if the information has been previously disclosed. (See *ante,* fn. 4.) Although the amendment is instructive, we reach our conclusion based on the plain language of former section 1102.5(b).

We also reject the County's interpretation that the statutory protections of former section 1102.5(b) do not apply when the disclosure of information addresses the wrongdoing of a fellow employee. In support of its argument, the County relies on an uncodified preamble to the 2003 amendments to former section 1102.5. (Stats. 2003, ch. 484, § 1, p. 3517; *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 469–470 [152 Cal.Rptr.3d 595].) The County highlights language in the preamble that the protection of former section 1102.5 applies only to those employees reporting "corporate wrongdoing." We agree with the conclusion reached in *McVeigh v. Recology San Francisco,* that former section 1102.5(b) protects disclosure of unlawful activity by third parties such as contractors and employees, and thus by its terms cannot be interpreted to be limited to unlawful conduct on the part of an employer or other high-ranking official. (*McVeigh v. Recology San Francisco,* at pp. 469–472.)

---

[5] *Meuwissen v. Department of Interior, supra,* 234 F.3d at pages 12 through 13 was legislatively overruled by the WPEA to the extent that the court found the appellant did not make a "disclosure" because the administrative ruling with which he disagreed was already publicly known. (See *ante,* fn. 4.)

2.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed as to the award of $2,006,015 in damages, and is otherwise affirmed. The order denying the motion for attorney fees is affirmed. The parties are to bear their own costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

A petition for a rehearing was denied September 18, 2014, and on August 19, 2014, the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied November 25, 2014, S221520.

---

*See footnote, *ante*, page 1538.